DEBORAH M. SMITH
Acting United States Attorney

SUSAN LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska  99513-7567
Telephone: (907) 271-5071
Facsimile: (907) 271-2344
susan.lindquist@usdoj.gov


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


| | |
|---|---|
| DONALD E. CARLING,<br><br>        Plaintiff,<br><br>  v.<br><br>ANN M. VENEMAN, Secretary,<br>Department of Agriculture<br><br>        Defendant. | Case No. 3:04-cv-211-JKS<br><br>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Ann Veneman, through counsel, moves pursuant to Fed. R. Civ. P. 56

for summary judgment.  Donald Carling ("Dr. Carling") claims that Alberto

Pantoja ("Dr. Pantoja") did not hire him for two research positions in the

Agricultural Research Service ("ARS") because of his age.  Dr. Pantoja had

just terminated Dr. Carling from his research position in Palmer, Alaska and

Dr. Carling then applied for the position from which he had been terminated

which was as a plant physiologist in Palmer. A committee did not select

him as a candidate to be interviewed. Dr. Carling also applied for a position

in Fairbanks, Alaska and Dr. Pantoja did not select him to be interviewed.

Dr. Pantoja had legitimate reasons for not hiring a person he had just

terminated. Dr. Carling's age had nothing to do with his non-selection.

FACTS

ARS operates agricultural research units in Alaska and it primarily

hires scientists with doctorate degrees in agriculture to research a variety of

plant science issues. Ex. A. The specialists include plant physiologists,

who study how plants grow and react to their environment, plant

pathologists, who study plant diseases, and entomologists, who study

insects that attack plants. Ex. A at 3-4; Ex. B at 12. Geneticists also

contribute by extracting the DNA from plants to study environment

interactions and inheritance of plant. Ex. A at 5.

Dr. Carling obtained a Ph.D. in plant pathology in 1975 and from 1981

until 2003 he was a professor at the University of Alaska at Fairbanks

("UAF") at the Palmer Agriculture Experimental Farm. Ex. C. at 70, 75. In

2002 when he was approximately 58 years old (DB November 1945), he applied for three positions offered by the ARS: the leadership position in Fairbanks, the plant pathologist position in Fairbanks, and the plant physiologist/geneticist position in Palmer. Ex. B at 10-11, 42.

## SELECTION PROCEDURE

The ARS selection procedures are governed by national guidelines. After the position description is approved, the position is advertised. Ex. D at 819. After the position closes, a Specialist in Human Resources from the Human Resources Division in Maryland determines which candidates are eligible for the particular position based on the recruitment specifications. Ex. D. The Human Resources Specialist suggests that local leaders use an evaluation panel to select at least two candidates who are highly qualified for the position. The panel should supply the selection official with recommendations about the specific knowledge and skills of the candidates. Ex. D. After the best two or three are selected, the selecting official should check references and interview candidates. The candidates also meet with the evaluation panel for a more intensive question and answer session. Ex. D. Before selection is official, the officer must discuss

the proposed selectee with the Area Director.  Thereafter, the selecting

official can discuss the position with the proposed selectee and negotiate

an informal offer.  Ex. D at 820.  An official offer can only be made by the

personnel specialist from the Human Resources Division national program

after the certificate is signed by the selecting official and the signed

concurrence is made by the area director.  Ex. D at 820-21.


## PLANT PHYSIOLOGIST POSITION

Dr. Michael Shannon, as Acting Research Leader for Fairbanks,

chaired the selection of the plant physiologist/research geneticist for

Palmer, Alaska.  Ex. E  at 683, 685.  Dr. Antoinette (Toni) Betschart was the

Area Director for the Pacific Region and she had the authority to concur.

Ex. E at 684; Ex. F at 693.  The position was advertised on a few occasions

and on October 1, 2002, Christine Issac, a Human Resource Specialist

located in Maryland, issued an amended list of six eligible candidates for

the Palmer physiologist position, which included Dr. Carling.  Ex. F 690-91.

About the same time in October 2002, Dr. Pantoja, who was born in

1956, was selected as the new Research Leader for Fairbanks, but he did

not officially start with ARS until April 20, 2003.  Ex. E at 683, Ex. G,  Ex. Y.

Before officially being appointed, he was included in discussions about hiring for the new Palmer position because he was going to be the supervisor. On October 16, 2002, Dr. Pantoja emailed Dr. Betschart about his trip to Palmer and the fact that he was unable to meet with Dr. Carling as he was out of the country. Ex. E at 684. Dr. Betschart emailed in response that Dr. Shannon was assigned the recruitment for Palmer and that Dr, Carling was the potential successful applicant. Ex. E at 683. She informed him that she asked Dr. Shannon to discuss this with him. Ex. E at 683. On October 17, 2002, Dr. Pantoja emailed Dr. Betschart that he "appreciated the opportunity to participate in the selection process." Ex. E at 685. She emailed in response, "Mike Shannon will be following up with Dr. Carling. Assume we are all in agreement that the offer will be made to Don, if the discussions proceed well with him." Ex. E at 689, 684. Dr. Carling was perceived to be a good scientist. Ex. E at 686  Dr. Pantoja offered positive feedback about Dr. Carling to Dr. Betschart. Ex. E at 684.

No interviews were done. Dr. Shannon telephoned Dr. Carling and offered him the job sometime in October and by November, Dr. Shannon was asking Dr. Carling about start dates. Ex. B at 6. Dr. Pantoja later met Dr. Carling in Fairbanks in March 2003 at the University of Alaska, at

Fairbanks and at night, Dr. Pantoja and his wife met Dr. Carling for dinner. Ex. B at 7.

On April 16, 2003, Ms. Issac wrote Dr. Carling a letter officially informing him that he had been selected as a plant physiologist in Palmer, Alaska at a GS-14 level.  Ex. H.  A scientist hired at the GS-14 and was expected to be a professional, due to his years of specialized training, and it was not expected that he would require much training.  Ex. I; Ex. Y

On May 4, 2003, Dr. Carling started working as a physiologist in Palmer, Alaska.  Due to various issues, in a letter dated October 3, 2003, Dr. Pantoja terminated Dr. Carling while he was a probationary employee. Ex. J.  That termination is not at issue in this lawsuit, but it permeates the background of subsequent actions.

Dr. Pantoja had several administrative issues with Dr. Carling.  He was informed that he needed to co-ordinate all corroboration with other ARS scientists through Dr. Pantoja, but he did not.  Ex. K; Ex. Y.  In addition, Dr. Carling, on his own, contacted the University of Alaska at Fairbanks to seek emeritus status and adjunct status for other ARS scientists without informing Dr. Pantoja.  Ex. K.  Dr. Pantoja perceived that Dr. Carling was not responding to his inquiries in a timely manner.  Ex. Y.

Lastly, in late September, 2003, the research unit in Palmer had to submit its prospectus for the Project Plan for the next few years to the Office of Scientific Quality Review at national headquarters. Dr. Carling was required to submit a section proposing what he was going to do and his section was rejected by the reviewers at the Area and National Program Staff level. Ex. L at 961. Dr. Pantoja informed Dr. Carling of the reviewer's comments, but Dr. Carling resisted incorporating their changes and wanted to speak with the reviewers. Ex. L at 945, 950, 953. Dr. Pantoja perceived that Dr. Carling was not focusing on his research prospectus and not communicating with him. Ex. L at 957. Dr. Pantoja decided to consult with headquarters about terminating Dr. Carling and he prepared a chronology for headquarters explaining the various interactions with Dr. Carling. Ex. K. Ex. Y.

The termination letter came as a "bolt out of the blue" for Dr. Carling. Ex. B at 37-8. Dr. Carling thought that the letter was unclear and did "not make sense." Ex. B at 34-35. Dr. Carling thought that he had been responsive and that the reasons stated for his termination did not "wash" and were not true. Dr. Carling believes Dr. Pantoja treated him the way he did was because of his "age and experience." He came to that conclusion

for lack of any other explanation.  Ex. B at 37.

### A. For The Palmer Physiologist/Geneticist Position, The Committee Did Not Select  Dr. Carling For An Interview                          .

After Dr. Pantoja terminated Dr. Carling, the ARS advertised for a Research Geneticist/Plant Physiologist in Palmer, Alaska, ARS X4W-0133, with an opening date of January 5, 2004 and a closing date of February 17, 2004.  Ex. M.   Dr. Carling submitted his old resume in response to advertisement ARS X4W-0133 and it did not include the fact that he had retired from the University and had worked for ARS for about five months and had been terminated.  Ex. N.  Dr. Carling was listed as reinstatement eligible.  Ex. O.   Dr. Pantoja selected the top two or three candidates for interview, but he did not select Dr. Carling.  Ex. Y.  After interviews, he offered the position to two candidates, Dr. Haagenson, a plant physiologist and Dr. Kuerston, a plant geneticist, but they both declined the offer.  Ex. P, Ex. X.

The position was then re-advertised as ARS X4W-0350A with an expiration date of February 4, 2005.  Ex. O.  A summary of eligible candidates listed many names, including Dr. Carling.  Ex. Q at 263.  Applicants from both vacancy announcements were considered.  Ex. Q at

255.  A committee had formed to select the top three candidates from the list of eligible applicants, including Dr. Carling and it received the applications to review and participated in a conference to select the top candidates.  Ex. R.  Members of the committee discussed the position and agreed that a scientist with a strong background in physiology would best suit the position.  They then listed their top picks from the resumes.  After the first poll, some members had listed Dr. Carling on their short list.  When the Committee discussed Dr. Carling, the issue arose that he was no longer working for the university and that he had been with ARS for five months.  No details were given about why Dr. Carling was no longer at ARS.  The Committee consisted of the following individuals:

1.  Dr. Pantoja, (Panel Chair)
2.  Dr. Rich Novy, Research Geneticist, ARS Aberdeen, ID
3.  Dr. Dave Ianson, Horticulturist and Curator, Palmer
4.  Dr. Nancy Robertson, Research Plant Pathologist, Palmer
5.  Dr. Stephen Sparrow, Associate Dean, Natural Resources and Agricultural Science, UAF, Fairbanks AK
6.  Stoney Wright, Plant Management Center, State of Alaska Palmer, AK
7.  Dr. Allen Mitchell, Associate Dean, School of Agriculture and Resources Management, Palmer, AK
8.  Dr. Chuck Brown, Research Geneticist, ARS, Prosser WA

Ex. S.  The committee selected three candidates for interview, but it did not select Dr. Carling.  Dr. Sparrow did not select Dr. Carling because

he was a pathologist and the position requirements could best be met by someone with a strong physiology background. Ex. S. The Committee, plus additional members including Dr. Faust and Dr. Bretting from the National Program Staff, interviewed the candidates from February 1-3, 2005. It selected Dr. Joseph Kuhl, a geneticist, who was approximately 34 years old (DB: November 1971). Ex. T. Dr. Sparrow thought he was a far better scientist for the position than Dr. Carling because Dr. Kuhl had a strong physiology background and genetics is part of physiology. Ex. S. The other two scientists selected for interview were physiologists: Dr. Guerra was a plant physiologist and biochemist and Dr. Barney was a plant physiologist and breeder who had worked with subarctic plants. Ex. Z .

Dr. Kuhl was a plant geneticist who could extract DNA from plants and study them at a molecular level. Ex. T. His Ph.D. thesis dealt with potatoes. Ex. T. 494. Dr. Kuhl was actively researching plant issues on the genetic and molecular level. 499-500. Dr. Kuhl was hired at a GS-12 position based on the OPM research evaluation guide and was expected to need guidance and direction. Ex. I at 77, Ex. Y. He was expected to receive training and some of it is done by visiting other sites where ARS is conducting research. Ex. I, Ex. Y.

B.    Dr. Pantoja Did Not Select Dr. Carling for the Pathologist
      Position in Fairbanks Because He Had Just Fired Him____.

The Fairbanks position was announced twice.  The last vacancy
announcement was listed as ARS X3W-3322R and it had a closing date of
December 5, 2003.  Ex. U.  Dr. Carling submitted an application with his
old resume on December 4, 2003.  Ex. B at 10-11, Ex. C at 75.  The letter
noted that he had retired from the University, but it did not indicate that he
had worked for ARS for five months.  Ex. C at 70.

Dr. Pantoja had a list of seven eligible candidates, including Dr.
Carling, and he picked the top three candidates, which did not include Dr.
Carling.  Ex. V,  Y.  A committee was formed for the interviews.  The
Committee selected Ms. Davelos, but after Ms. Davelos declined, Dr.
Pantoja offered it to Loretta Winton, who accepted it.  Both scientists had
experience with molecular reseach techniques.  Ex. W.  at 220; Ex. Y.  Dr.
Winton was over 40 years old when hired  (approximately 42).  Ex.  B at 54.
 Although Dr. Carling did not receive an interview, he did not have
extensive expertise in molecular techniques.  He had studied genetic
techniques while on sabbatical in 1997, but thereafter, he was unable to
work with DNA extraction because the University lacked the funding to set
up the laboratory.  Ex. B at  15, 18.

## STANDARD OF REVIEW

Summary Judgment is appropriate when there "is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law," F. R. Civ. P. 56(C); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party has the burden of showing that there is no genuine dispute as to material fact. Celotex, 477 U.S. at 323-35. To withstand summary judgment, the non-moving party must establish that there are genuine factual issues that may be reasonably resolved in favor of either party. California Architectural Building Products v. Franciscan Ceramics., Inc., 818 F.2d 1466 (9th Cir. 1987). There is no genuine issue of material fact when the relevant evidence in the record, taken as a whole, indicates that a reasonable fact finder could not return a verdict for the non moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## ANALYSIS

### I.   IT WAS PERFECTLY REASONABLE FOR ARS AND DR. PANTOJA TO DECLINE TO RE-HIRE DR. CARLING AFTER IT HAD TERMINATED HIM FROM SERVICE

The Age Discrimination in Employment Act ("ADEA") provides that it is unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 621 *et. seq*. The ADEA creates a cause of action for certain federal employees over the age of 40 who allege discrimination on the basis of age. *See* 29 U.S.C.A. § 633a. The courts apply the familiar McDonnell Douglas burden-shifting framework to resolve claims of age discrimination when the plaintiff produces no direct or circumstantial evidence of discrimination sufficient to warrant a "mixed-motive" analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); *See* Desert Place, Inc. v. Costa, 539 U.S. 90, 101-02 (2003). Under this framework, the plaintiff must first establish a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. To establish such a prima facie case, a plaintiff must demonstrate that: (1) he was a member of a protected class, *i.e.,* that he was at least 40 years old; (2) his employer had an open position for which he applied and was qualified; (3) he was rejected despite his qualifications; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff, whether within or outside the class protected by the ADEA. *See* O'Conner v. Consol. Coin Caterers Corp., 517 U.S. 308, 310-312 (1996).

Once a plaintiff makes this prima facie case, he creates a presumption of discrimination, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision. *See* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); McDonnell Douglas, 411 U.S. at 802-03. If the defendant satisfies this burden, the presumption disappears and the plaintiff must show that the articulated reason is a pretext for age discrimination. *See* Reeves, 530 U.S. at 142-43; McDonnell Douglas, 411 U.S. at 804. To do so, the plaintiff must do more than simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of age. *See* Reeves, 530 U.S. at 146- 47. The Plaintiff must prove that age was a determinative factor in the employment decision. Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-11 (1993).

"Where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." Bradley v. Harcourt, Brace and Company, 104 F.3d 267, 270-71 (9th Cir. 1996); Beaulieu v. Northrup Grumman Corp. 161 F. Supp. 2d 1135, 1147

n.8 (D. Hawaii 200) *citing* <u>McKnight v. Kimberly Clark Corp.</u>, 149 F.3d 1125,

1129 (10th Cir.1998) (stating that the fact that employee was hired at age

51 undercut allegation of general bias against workers over the age of 40).


II.    **DR. PANTOJA DID NOT DISCRIMINATE AGAINST DR. CARLING ON THE BASIS OF AGE WHEN HE WAS NOT SELECTED FOR THE PALMER POSITION BECAUSE A COMMITTEE SELECTED THE TOP THREE CANDIDATES AND SELECTED DR. KUHL**

ARS agrees that Dr. Carling has made a prima facie case of age

discrimination.  ARS has a legitimate, non-discriminatory reason for its non-

selection of Dr. Carling.  First, a committee, and not Dr. Pantoja, selected

the top three applicants.  Second, Dr. Pantoja had just terminated Dr.

Carling from the position at issue.  Last, Dr. Carling was not the best suited

scientist for the Plant Physiology/Geneticists position as he was a

pathologist and he did not have experience doing molecular studies.

For the Palmer position, a committee selected the top three

candidates to be interviewed, as well as the successful candidate, Dr. Kuhl.

 Although Dr. Pantoja was a member of the committee, there were seven

other members and they did not select Dr. Carling.  The decision on the

final three was made by vote and there is no evidence that Dr. Pantoja

dictated the results.  Dr. Pantoja informed the committee that Dr. Carling had been separated,  but he did not provide details.  As a committee did the selection for this position, there can be no claim that age discrimination played a role in the selection without some evidence that Dr. Pantoja overwhelmed the committee.  Drs. Ianson and Robertson were also on the committee, worked in Palmer, and knew that Dr. Carling had been terminated.

The final three candidates had qualifications that matched the job description in the vacancy announcement.  Dr. Carling, as a pathologist, had enough plant physiology to qualify to bid, but he did not match the requirements as well as the three selected candidates.  According to Dr. Sparrow, Dr. Kuhl, a plant geneticist, was a superior candidate for the Palmer position.  The ARS Palmer Project did not need a pathologist because it already had Dr. Robertson, who is a plant pathologist with a sub-specialty of virology.  Ex. A at 3; Ex. B at 70.  Because Palmer is a small research unit with three scientists,  Dr. Carling, Dr. Ianson and Dr. Robertson,  it would not be useful to duplicate specialized knowledge.  *See* Ex. B at 28.  Dr. Kuhl's expertise was more responsive to the advertised position description.  Ex. R.

ARS and Dr. Pantoja have produced legitimate, non-discriminatory reasons for the selection of Dr. Kuhl over Dr. Carling for the physiologist/geneticist position in Palmer.  A Committee made the decision not to interview him, and Dr. Carling, as a pathologist, was not the best suited scientist for a physiologist/geneticist position.

## III.    DR. PANTOJA DID NOT WANT TO WORK WITH DR. CARLING IN FAIRBANKS

Dr. Carling thought Dr. Pantoja would "come to his senses" and consider him for the position in Fairbanks.  Ex. B at 50.  Dr. Carling agrees that Dr. Pantoja would have some reservations about hiring him and that the negative feelings might persist.  Ex. B at 57.  Dr. Carling thought the fact that he had just been terminated from the position he was applying for would be an obstacle.  Ex. B 44-45.

Dr. Carling is correct.  Dr. Pantoja did not select Dr. Carling as one of the top three candidates to be interviewed because he had just terminated Dr. Carling.  Ex. Y.  Dr. Pantoja had the opportunity to observe Dr. Carling, his scientific methodology and his ability to interact with the team, and the end result was that Dr. Pantoja did not like the way that Dr. Carling worked and failed to keep him informed.  He did not like Dr. Carling's lack of

attention to revising his prospectus, which is the guiding document for his research. Ex. Y. Dr. Carling just did not work out and there was no reason for Dr. Pantoja to hire him for a position in Fairbanks where they would have to work closely together. Age had nothing to do with it.

Moreover, in this case there is an inference that age was not the motivating factor because Dr. Pantoja participated in the original hiring process, though he was not the selecting official. Dr. Pantoja was informed in emails about the selection and he discussed it with Dr. Betschart. He tried to meet Dr. Carling on October 8, 2002, but was unable to do so until March, 2003. Dr. Pantoja had a positive impression from the meeting, and Dr. Carling was hired. Dr. Carling will argue that he was hired by Dr. Shannon in October, even though he did not get the written offer until many months later. Under the hiring guidelines, Dr. Shannon could informally negotiate, but only the Human Resources Specialist could formally offer Dr. Carling the position. Dr. Pantoja supported Dr. Carling's initial hire to Dr. Betschart, who had the ultimate authority to recommend the candidate for hire. Under Bradley, when a manager hires an employee, knowing his age, and then terminates the person within a short period, age is presumed not to be an ingrained bias because it is illogical that a manager would

discriminate against the person at one stage of the employment process, but not the other. Dr. Pantoja was well aware of Dr. Carling's age when he was hired, but did nothing to prevent the hiring. In fact, his comments before the hiring were supportive of Dr. Carling. This is proof of a non-discriminatory intent.

As proof of discriminatory intent, Dr. Carling will argue that Dr. Pantoja treated the new, younger employee, Dr. Kuhl, better than he treated Dr. Carling. He will argue that Dr. Kuhl was given travel opportunities and equipment which were denied Dr. Carling when he had the job. He will argue that this favorable treatment of Dr. Kuhl shows favoritism for younger scientists.

Dr. Kuhl was hired at two full grades lower than Dr. Carling. Ex. Y. He was not expected to be a seasoned professional. He was expected to require more training. In addition, Dr. Kuhl is not a plant pathologist, he is a plant geneticist and he is the first one at the ARS Palmer facility. Ex. Y. Thus, he required significant additional equipment. By contrast, Dr. Carling could use the fully-equipped laboratory he had been using for 15-20 years at UAF, Palmer, as part of the UAF-USDA-ARS agreement. ARS was in

the process of building a greenhouse and laboratory for the Palmer facility when Dr. Carling was there.  Ex. Y.

Dr. Carling alleges that the former firing should not have played a role in Dr. Pantoja's decision about his replacement.  But Dr. Carling himself acknowledges that the termination is significant.  Dr. Carling did not add the information about his ARS employment to his resume.  Originally he stated that it slipped his mind.  Ex. B at 58-59.  But later he admitted that he had not slipped his mind and that perhaps he was embarrassed about the termination.  Ex. B at 59.  Certainly it is a major action in his life and one that was fresh in his memory as it was in Dr. Pantoja's.  The only astonishing thing is that Dr. Carling would apply for jobs to be supervised by the same person who just terminated him.

Dr. Carling will argue that the termination was based on age discrimination and thus his non-selection for the Fairbanks' pathology position was also based on age.  When Dr. Carling was terminated, he did not think that age was a factor, but later he thought it was because in the absence of anything else, it had to be age.  Ex. B at 33.  Dr. Carling believes that Dr. Pantoja treated him the way he did because of age and experience.  Ex. B at 37.  He made this conclusion for lack of anyother

reason. Id. This demonstrates Dr. Carling's inability to accurately recognize the problems with his pre-termination performance. Ex. B at 38. Dr. Carling concluded that Dr. Pantoja did not like it when someone knew more than he did and that he was threatened by experienced scientists. Ex. B at 38, 69. Dr. Carling equates experience with age. Ex. B at 38.

But Dr. Carling is wrong. Both scientists who were selected for the pathology position had experience and training that was different and more valuable than Dr. Carling's experience. Both Ms. Davelos and Ms. Winton were doing research at the molecular level, which includes drawing out DNA from a plant. They had more advanced research techniques than Dr. Carling. Dr. Carling, himself, recognized this expertise as valuable as he attempted to gain expertise in genetics and techniques used to study genetics during his experience in 1997 in Australia. Ex. Ex. B at 14-15. Unfortunately, he was not able to do any molecular work thereafter as he was unable to set up an appropriate laboratory. Ex. B at 15, 18, & 95. Thus, he was less competitive than scientists who were actively applying molecular techniques in their research. Most students graduating now are molecular. Ex. B at 94-95. Scientific experience is not necessarily something that comes with age; it also comes with training.

There is no direct or circumstantial evidence of discrimination on the basis of age. There is no evidence that Dr. Pantoja ever stated that he preferred younger scientists or that he did not like old scientists. Ex. B at 32-33. In Fairbanks, Dr. Bechtel is still working and he is between 50 and 60 years old. Ex. B at 32. Dr. Pantoja was 47 years old at the time of the separation, though Dr. Carling thought he was in his mid-40's. Ex. B at 32. Dr. Pantoja hired Dr. Winton, who was over 40 years old. There is no evidence that Dr. Carling's age was a motivating factor in his non-selection. It is simply illogical to conclude that Dr. Pantoja did not select Dr. Carling because of his age, in light of the overwhelming fact that Dr. Pantoja had observed Dr. Carling, did not like the way he worked, and did not want to work closely with him in Fairbanks. No reasonable juror would expect Dr. Pantoja to hire a person he just fired.

## CONCLUSION

Dr. Pantoja was unhappy with Dr. Carling's work and terminated him in October 2003. He was not going to hire Dr. Carling for a position in Fairbanks where they would be working closely together on research. For the Palmer position, a committee selected the top three candidates. Dr. Pantoja was only one of eight members and there is no evidence of

discrimination based on age.  What is astounding is that Dr. Carling would even apply for the job he just lost and then allege that his age, rather than his recent termination, was the real reason he was not re-hired.

Dr. Carling has no evidence, either direct or circumstantial, that age was the motivating factor in any person's decision not to select him.  When Dr. Carling was hired the first time, Dr. Pantoja was a participant in that decision and he supported Dr. Carling.  From this fact, the fact finder can presume that there was no bias based on age.

Because Dr. Carling cannot rebut ARS' legitimate and non-discriminatory reason for not hiring him was anything other that his recent termination, the Court should grant the government summary judgment.

RESPECTFULLY SUBMITTED on March 15, 2006.

DEBORAH M. SMITH
Acting United States Attorney

s/ Susan J. Lindquist
Assistant U. S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail: susan.lindquist@usdoj.gov
AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2006,
a copy of the foregoing DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT was served
electronically on Hugh W. Fleisher.

<u>s/ Susan J. Lindquist</u>