IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DONALD E. CARLING., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANN M. VENEMAN, Secretary | ) |
| Department of Agriculture | ) |
| | ) |
| Defendant. | ) CASE NO: A04-0211 CV (JKS) |
| _____ | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Donald E. Carling, through his undersigned counsel, hereby submits his response to Secretary Veneman's Motion for Summary Judgment.

**I. LEGAL STANDARD**

A motion for summary judgment should be viewed in a light most favorable to the party opposing the motion and the latter party is entitled to the benefit of all inferences reasonably deducible from the evidence. The clear burden is on the movant to establish both that there is no genuine issue as to any material fact and that and that the movant is entitled to judgment as a matter of law.

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 26 L.Ed2d 142 (1970); *Eisenberg v. Insurance Co. Of North America*, 815 F.2d 1285 (9th Cir.1987).

## II. MR. CARLING HAS STATED A CLAIM UNDER TITLE VII

There are clearly disputed material facts regarding this claim by the plaintiff. Mr. Carling has met his burden to state his prima facie case under *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct 1817, 36 L.Ed2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981) and their progeny. This Circuit and the majority of Circuit Courts hold that, the plaintiff had "unquestionably established" a *prima facie* case of discrimination in promotions by showing that "(1) he belongs to a protected class, (2) he was performing according to his employer's legitimate expectations, (3) he suffered an adverse employment action of dismissal and (4) other employees with qualifications similar to his own were treated more favorably." *Peterson v. Hewlett-Packard Co.*, 358 F. 3d 599 (9th Cir. 2004); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998). "To establish a prima facie case, the plaintiff must show that (1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications she was rejected; and (4) either someone not of her

protected class filled the position…." *Cones v. Shalala*, 199 F.3d 512, 516, 81 FEP Cases 1650 (D.C. Cir. 2000), in which the Court reversed the grant of summary judgment to defendant on the Title VII claim.  *Accord*, *Denesha v. Farmers Insurance Exchange*, 161 F.3d 491, 501 (8th Cir. 1998); *Anaeme v. Deagnistek, Inc.*, 164 F.3d 1275, 1278 (10th Cir.), *cert. denied* 528 U.S. 814 (1999).  However, where, as here, the plaintiff has produced direct evidence of discrimination, the *McDonnell Douglas, supra,* test for the response of the employer and the respective need, on the part of the plaintiff to prove such response to be "pretext."  In such an instance the *McDonnell Douglas*, *id,* is "inapplicable".

"The *Price Waterhouse v. Hopkins*, 499 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), mixed-motives theory of discrimination comes into play where direct  evidence of discrimination is presented, but the employer asserts that the same adverse employment decision would have been made regardless of  discrimination. Although *Price Waterhouse* can be characterized as a method to prove discrimination, the mixed-motives theory is probably best viewed as a defense for an employer. See *Price Waterhouse*, at 246  'The employer's burden is most appropriately deemed an affirmative defense: the plaintiff must persuade the

factfinder on one point, and the employer, if it wishes to prevail, must persuade it on the another.'  Unlike **McDonnell Douglas**, which simply involves a shifting of the burden of production, **Price Waterhouse**, once a plaintiff presents direct evidence of discrimination, the burden of proof shifts to the employer to show that the same adverse employment decision would have been made regardless of discriminatory animus.  If the employer fails to carry this burden, plaintiff prevails." **Rachid v. Jack In The Box, Inc.**, 376 F.3d 305 (5th Cir. 2004).

**II. THE REASONS STATED FOR DR. CARLING' TERMINATION WERE FALLACIOUS**

As the government noted in its brief, p. 6, although the termination of Dr. Carling is not in specific issue at bar, "it permeates the background of subsequent actions." (*Id*.) Needless to state, the plaintiff, Dr. Carling, age  has an entirely different interpretation of the facts regarding such termination than that presented by Secretary Veneman. The government asserts that one of the reasons for the termination was that Dr. Carling had failed to coordinate collaboration with other scientists of the Agricultural Research Service of the U.S. Department of Agriculture ("ARS").  (p.6)  However, government Exhibit K sets out the request that any Dr. Carling collaborations "with external

4

units be coordinated first with [Dr. Pantoja]" (Ex. K, 3rd ¶). There is nothing therein that suggests that Dr. Carling violated this suggestion. Even the Declaration of Dr. Pantoja (Ex. Y), and prepared for this litigation, simply states the conclusory statement that "I was unhappy with Dr. Carling's inability to work through me as the lead scientist for the project and Research leader when communicating with outside facilities." (*Id.*) There is nothing else in the record that supports such conclusion.

The government has also averred that Dr. Carling contacted the University of Alaska, Fairbanks, Alaska to seek emeritus status and adjunct status for other ARS scientists without informing Dr. Pantoja. As the affidavit of Dr. Carling clearly illustrates (Ex. 2), along with Exhibit 1, such averment is wholly without merit. There was no emeritus matter for other ARS scientists. Such only applied to Dr. Carling, which had been decided before he left his professorship at the University of Alaska. Moreover, the emeritus status had no relationship with ARS. The adjunct professor status for Dr. Carling had also been discussed with Dr. Carling, again, before he left the University. The University representative termed the adjunct professor position for ARS scientists to be "automatic." When the University asked Dr. Carling for information about the other scientists in ARS, he immediately said to the University

5

that they should check with Dr. Pantoja. ( Exs. 1, 2). Therefore, this specific ground for termination is fallacious.

The next ground on which Dr. Pantoja terminated Dr. Carling is the Dr. Pantoja perceived that Dr. Carling was not responding to his inquiries in a timely matter. (Govt. Brief, p. 6)  The government cites Exhibit Y in support for this supposition.  However, Exhibit Y makes no reference to a failure to respond to Dr. Pantoja' inquiries.  Dr. Carling asserts that the record is otherwise silent in regard to such matter.

As to the final matter cited for Dr. Carling's termination, that being work on the prospectus that was to be the "Project Plan for the next few years to the Office of Scientific Quality Review at national headquarters.  (Govt. Brief, p. 7)  Dr. Carling made a qualitative response to Dr. Pantoja regarding the proposed changes in the prospectus, raising specific issues of fact, relating to the scientific import of potato chipping and fundamental research regarding devil's club plants as having a prospective medicinal effect. (Ex. L, p. 950.  There is no record of Dr. Pantoja responding to these observations.  Dr. Pantoja asserts that Dr. Carling has not responded to his e-mails [of September 22, 2003].  Yet, other than the e-mails that Dr. Carling sent to Dr. Pantoja in response to his and Dr. Pantoja's

6

brief response (Ex. L., p. 950), there is no record of other e-mails from Dr. Pantoja to Dr. Carling, as Dr. Pantoja claimed there was. However, Dr. Pantoja began the termination of Dr. Carling immediately following September 22, 2003, essentially holding Dr. Carling responsible for delaying the prospectus.  When one looks at the record, however, after the prospectus was in the sole hands of Dr. Pantoja, there was a year's delay in the prospectus being approved, after numerous attempts had failed and the project plan based upon the prospectus was not approved until another year in 2005.  (Ex. 3, pp. 889-895)  Moreover, the finally approved prospectus included the product of Dr. Carling. (*Id.*)

Thus, as can be seen from the above, the termination, which was at the heart of Dr. Pantoja'a refusal to consider for the two subject ARS positions, was without factual or legal foundation.

### III. DR. CARLING WAS NON-SELECTED FOR THE TWO POSITIONS ON THE BASIS OF AGE DISCRIMINATION

Dr. Pantoja was the Chair of the committee considering the Palmer position that was convened in February, 2004 and the February, 2005.  Dr. Pantoja specifically acknowledged passing over Dr. Carling in the first attempted selection. (Ex. Y)  R. Scott Kuersten, one of the selectees, in the first round by Dr. Pantoja was 36 years of age.  (Ex X, p.

7

477). The other person selected was Darrin Haagenson, who appears to be younger than Kuersten, having obtained his PhD four years after Kuersten. (Ex. X, pp. 427-428). The latter interview and selection also had Dr. Pantoja's heavy hand into the process to dissuade the other committee members, of whom several worked under his supervision, from selecting Dr. Carling. The second review was also chaired by Dr. Pantoja. Dr. Carling was being considered as a top pick of a majority of the participants and that Pantoja used his chairmanship to avoid Carling being selected in favor of a 34 year old candidate. (Exs. 5 & T) Dr. Kuhl was provided with extensive ARS related travel as well as extraordinary purchases of research equipment costing at least $222,440.00, (Ex. 7) while Dr. Carling was frozen out of travel and received essentially no new equipment. (Ex. 4, p.39) Dr. Carling was far more qualified than the successful candidate. Carling had considerable experience over several decades with potatoes while Mr. Kuhl had only been out of school for approximately four years, when he applied for this position. Similarly, Dr. Carling had vast professional experience as a scientist dealing with arctic plants.( Ex. 4, pp.84-85) Moreover, Dr. Carling has a Personal Vita which lists eight pages of publications whereas Kuhl has six publications. (Exs. 6 & T, pp.6-7) The great divergence of ages between Carling and Kuhl along with

8

the clear and deliberately false reasons given for Dr. Carling's termination are sufficient bases for determining that there was age discrimination in the latter decisions that were interrelated with the termination. ***Reeves v. Sanderson Plumbing Products, Inc***., 350 U.S. 133, 120 S. Ct. 2097 (2000). ***Crockett v. Abraham,*** 284 F.3d 131 (DC Cir. 2001); ***EEOC v. Board of Regents of University of Wisconsin System***, 288 F.3d 296 (7th Cir. 2002); ***Yancey v. Weyerhaeuser Co.***, 277 F. 2d 1021 (8th Cir.2002).

## IV. DR. CARLING WAS DENIED THE FAIRBANKS POSITION ON THE BASIS OF AGE DISCRIMINATION

Dr. Carling applied for the Pathologist position in Fairbanks. Dr. Pantoja selected a substantially younger person for the position, Loretta Winton, approximately 42. Dr. Carling was an experienced pathologist, the very name of the position being selected. And yet, he was non-selected based upon Pantoja's having fired him. As shown above such firing had no factual basis and was a pretext. Dr. Carling relies on the cases set out above in III.

## V. CONCLUSION

Where, as here, the defendant has made purported non-discriminatory reasons for non-selection of Dr. Donald

Carling, the "… plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." The Court continued: "To avoid summary judgment, a plaintiff need not demonstrate that discriminatory reasons motivated the employer's decision. ***Morgan v. Hilti, Inc***., 108 F.3d 1319, 1321-1322 (10th Cir. 1997). Moreover, an indicia of pretext can be found in whether a member outside of the protected class was treated differently than the plaintiff. ***O'Connor v. Consolidated Coin Caterers Corp.***, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed 2d 433 (1996), ***Reeves v. Sanderson Plumbing Prods., Inc***., 530 U.S. 133, 147 L.Ed.2d 105 (2000. Here, as shown by the above, there is clear and undisputable evidence that Dr. Carling was not hired for the two subject positions, just as he had been terminated by Dr. Pantoja, discriminatorily, on the basis of age.

For all the additional reasons set out above and in the plaintiff's exhibits, Dr. Carling believes that Secretary Veneman's Motion for Summary judgment should be denied.

    DATED at Anchorage, Alaska, this 17th day of April, 2006.

    LAW OFFICES OF HUGH W. FLEISCHER
    Attorneys for Plaintiff

    S/ Hugh W. Fleischer
    Hugh W. Fleischer

Alaska Bar No. 7106012


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 17th day of April, 2006, a true and accurate copy of the foregoing was electronically served to:

Susan Lindquist
Assistant U.S. Attorney
222 W. 7th Ave., # 9, Rm. 253
Anchorage, AK 99513-7567


S/ Hugh W. Fleischer
LAW OFFICES OF HUGH W. FLEISCHER
9412/514