DEBORAH M. SMITH
Acting United States Attorney

SUSAN LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Rm. 253
Anchorage, Alaska  99513-7567
Telephone: (907) 271-5071
Facsimile: (907) 271-2344
susan.lindquist@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DONALD E. CARLING,<br><br>        Plaintiff,<br><br>    v.<br><br>ANN M. VENEMAN, Secretary,<br>Department of Agriculture<br><br>        Defendant. | Case No. 3:04-cv-211-JKS<br><br>**DEFENDANT'S REPLY TO PLAINTIFF'S OPPOSITION TO ITS MOTION FOR SUMMARY JUDGMENT** |

This is a wrongful failure to re-hire case - - not a wrongful termination case.

Dr. Carling is trying to come through the back door to challenge ARS' decision

not to re-hire him because he could not sue for wrongful termination due to his

probationary status.  See Docket 6.  Although the termination provides a backdrop

for this case, the focus remains on whether Dr. Pantoja discriminated against him

on the basis of age when he was not re-hired for his old job, or the Fairbanks'
pathology position.  Dr. Carling failed to produce a scintilla of evidence that age
had anything to do with Dr. Pantoja's decisions or the Palmer panel's decisions
not to consider him.  There is no evidence of a single comment about age.  Age
was not discussed by the panel selecting the physiologist for Palmer.  Moreover,
as Dr. Pantoja participated in the hiring of Dr. Carling, and he met him before the
hiring process was completed, there is a presumption that age was not the
motivating factor in Dr. Pantoja's decisions regarding Dr. Carling.

Dr. Carling argues that he is not required to demonstrate that discriminatory
reasons motivated the employer's decision.  See Docket 21 at 10.  Although the
Tenth Circuit in Morgan v. Hilti, Inc., 108 F.3d 1319, 1321-22 (10th Cir. 1997) did
write that, it affirmed the  District Court's granting of summary judgment because
"[a]fter reviewing the record de novo . . . and construing the factual record and all
reasonable inferences therefrom in the light most favorable to Morgan . . . [it]
determine that Morgan did not raise any material issues of fact as to Hilti's
motivation. . . ."  Dr. Carling, too, did not raise any issues of material fact about
Dr. Pantoja's motivation not to re-hire him for the Fairbanks or Palmer positions,
as well as the panel's decision not to select Dr. Carling for the short list of
candidates.  Dr. Carling's only explanation for why he thinks age played a role

remained, "for lack of any other conclusion." Docket 17 at 4, pg. 37. Moreover, in Dr. Carling's mind, age and experience were intertwined. According to Dr. Carling, Dr. Pantoja did not reject him because of his chronological age, but because he knew too much about the science of potato growing in Alaska. See Docket 17, at Ex. B at pg. 38. Dr. Carling concluded that Dr. Pantoja did not like people who knew something he didn't know. This argument does not raise any material issue of fact about Dr. Pantoja's motivation not to re-hire Dr. Carling. The law does not protect discrimination on the basis of experience.

First, although Dr. Carling stated that he presented direct evidence of age discrimination, he did not state what that was. See Docket 21 at 3. "'Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) (citation omitted). The Ninth Circuit gave examples of direct evidence by citing to cases in which the decision maker made comments which exposed bias. In this case, there is no direct evidence because there is no comment indicating that Dr. Pantoja did not like older people. Therefore, the only way Dr. Carling can rebut the government's showing of its valid reason for not hiring him is by using the circumstantial evidence.

Dr. Carling did not produce circumstantial evidence either.  Circumstantial evidence is evidence "that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable.  Such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex.  *See* <u>Bradley</u>, 104 F.3d at 270 (no evidence beyond that produced for the prima facie case presented);  <u>Collings</u>, 63 F.3d at 834 (no evidence beyond that produced for the prima facie case presented);  <u>Wallis</u>, 26 F.3d at 890 (no evidence beyond that produced for the prima facie case);  *see also* <u>Nidds</u>, 113 F.3d at 918 (circumstantial evidence of shifting explanations are not 'sufficiently probative')."  <u>Godwin</u>, 150 F.3d at 1222.  Instead of presenting circumstantial evidence to rebut Dr. Pantoja's reasons for not re-hiring him, Dr. Carling primarily presented evidence to rebut the reasons Dr. Pantoja terminated him.  But that is not the action at issue.  Dr. Carling had to produce specific and substantial evidence that the reason Dr. Pantoja did not re-hire him was his age. He did not.  We will look at the circumstantial evidence he presented for each hiring decision.

I.    THERE IS NO EVIDENCE THAT DR. PANTOJA INFLUENCED
THE SELECTION COMMITTEE IN PALMER

In regards to the Palmer position, Dr. Carling supported his argument of age

discrimination almost solely by pointing out that the person hired, Dr. Kuhl, was

younger and was treated more favorably than Dr. Carling because he was given

travel and equipment. Docket 21 at 8.  Dr. Carling, however, complained of age

discrimination, and filed his Complaint on September 2003, even before Dr. Kuhl

was involved.  Dr. Kuhl signed his application in August 2004 and was not hired

until 2005.  Docket 17 at Exs. Y & T.  Thus, Dr. Carling was alleging age

discrimination even before Dr. Kuhl's application was in the mail.  He alleged

discrimination on the basis that he did not get an interview for the first selection

process in which Dr. Haagenson and Dr. Kuerston were selected, but both

declined the job.  Docket 17 at 8 & Ex. P & X.  Therefore, at the time Dr. Carling

claimed age discrimination to the EEOC, his competition was those two doctors,

and not Dr. Kuhl.  Yet, he relies solely on the selection of Dr. Kuhl, the alleged

special treatment of Dr. Kuhl's travel and equipment request to rebut the non-

discriminatory reason for not interviewing him for the Palmer job.  He did not

present direct or circumstantial evidence of age discrimination at the time Dr.

Pantoja did not interview him during the first selecting attempt.  Dr. Kuhl's hire

and treatment in 2005 certainly would not justify a claim of discrimination made

in a September 2003 Complaint.

Even considering later events, Dr. Carling argues that Dr. Pantoja used a

"heavy hand" to influence the selection committee for the Palmer job so that he

could select his candidate Dr. Kuhl.  Docket 21 at 8.  Dr. Ianson, a member of the

committee, can testify about his observations and actions.  But he lacks personal

knowledge about why the other members of the committee voted the way they did.

See Fed. R. Evid. 602.  He does not state that he surveyed the other seven

members of the committee and determined that Dr. Pantoja's heavy hand forced

them to change their minds.  Dr. Sparrow stated that he did not select Dr. Carling

because he was not a physiologist or geneticist, which is the type of scientist the

position called for.  See Docket 17 at Ex. R.  Dr. Ianson is speculating.

Even if there was a dispute of fact about why the committee selected the top

three candidates, it is immaterial because age was not discussed at the meeting and

Dr. Ianson does not dispute that.  See Ex. R.  Dr. Ianson wrote that Dr. Pantoja

told the committee that Dr. Carling had worked for ARS and no longer worked for

ARS because of performance problems.  Had Dr. Carling updated his resume,

there would not have been any need to correct the record.  It is not discrimination

on the basis of age to inform a committee about a candidate's work history which

is not stated in the application.  This information is true and it does not include a reference to age.

Dr. Ianson also opines about other facts about which he has no personal knowledge.  He asserts that Dr. Pantoja favored Dr. Kuhl.  Dr. Ianson has no personal knowledge about who Dr. Pantoja preferred.  Dr. Kuhl was not among the candidates the first time Dr. Pantoja unsuccessfully tried to fill the position.  In the later selection, three scientists were interviewed and Dr. Ianson does not explain what Dr. Pantoja did during the interview to convince the committee to select Dr. Kuhl.  Dr. Ianson is again speculating.

Dr. Carling argues that he was the most qualified candidate by virtue of his research.  Docket 21 at 8.  That is his opinion.  Dr. Carling had no molecular research skills and even he had recognized the value of molecular research as he attempted to gain the skills and also stated that most research scientists graduating are molecular scientists.  Docket 17 at 11 and Ex. B at 94.  Dr. Carling did not rebut this argument.  Thus, it is not established that Dr. Carling, as a pathologist, was the best candidate for a physiology position, as he was competing with other scientists who were molecular scientists.  *See* Exs. T at 492 at no. 2) and X at 472, 477.

Dr. Carling further argues that circumstantial evidence of Dr. Pantoja's

dislike of older people is the fact that once Dr. Kuhl was on staff, he was treated better than Dr. Carling because he was given more equipment and allowed to travel more. Dr. Carling is using post-decisional facts to imply a discriminatory motive for the selection decision made a few years beforehand. This evidence is irrelevant because at the time Dr. Pantoja and later the Palmer committee rejected Dr. Carling, there was no selectee. In addition, Dr. Carling makes this argument without listing the equipment he requested and which ARS denied. Nor does he acknowledge that Dr. Kuhl is a geneticist working on the molecular level needed equipment to extract DNA, which Dr. Carling did not. Dr. Carling and Dr. Kuhl were simply not similarly situated as Dr. Carling is a pathologist and Dr. Kuhl is a geneticist. Dr. Carling was hired at a GS-14 level and would allegedly need less training. Dr. Kuhl was hired at a GS-12 level and would need training.

Dr. Carling also argues that his resume was more extensive that Dr. Kuhl's. Docket 21 at 8. Certainly Dr. Carling who had had a prior career as a professor had more publications than Dr. Kuhl. But this is not the specific and substantial circumstantial evidence needed to defeat a motion for summary judgment because all candidates for the position who are just completing their Ph.D. will have fewer publications. However, the one undeniable fact is that Dr. Kuhl's experience met the position descriptions requirement for a physiologist or geneticist. Dr. Carling

did not because he was a pathologist.  The Palmer facility already had a

pathologist, Dr. Robertson.  Lastly, Dr. Carling was not similarly situated to the

other candidates because he was the only one who ARS had terminated.  He was

not re-applying for his old job with a blank slate.

II.    DR. PANTOJA WAS JUSTIFIED IN DECLINING TO RE-HIRE A
       PERSON HE HAD JUST FIRED, WHO WOULD BE WORKING
       WITH HIM IN FAIRBANKS

Dr. Carling argues in one paragraph that Dr. Pantoja discriminated against

him when he selected Ms. Winton for the Fairbank's pathology position because

he is a pathologist.  Docket 21 at 9.  Dr. Winton was also a pathologist and she had

molecular experience, which he lacked.  See Docket 17 at 11.  Dr. Carling did not

rebut the evidence that Dr. Winton had more advanced scientific experience.

Moreover, there is no evidence to rebut the fact that Dr. Pantoja did not want to

work with Dr. Carling as he had just terminated him.

III.   ALTHOUGH THE TERMINATION LETTER WAS TRUE, IT IS
       IRRELEVANT TO THE DECISION NOT TO RE-HIRE DR. CARLING
       FOR THE JOB FROM WHICH HE WAS TERMINATED

Dr. Carling is barred from challenging the termination.  Under the

McDonnell Douglas burden shifting formula, Dr. Carling has to rebut the non-

discriminatory reasons given for not re-hiring him.  He cannot rebut the non-

discriminatory reason of that decision, based on the alleged pre-textual reasons for

another decision, the termination, given many months previously. Once the reason for the decision not to re-hire Dr. Carling was made, Dr. Carling had to "demonstrate that the proffered reason was not the true reason for the employment decision," which "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." <u>Texas Dep't. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256, (1981). The employment decision is the decision not to re-hire him. Dr. Carling has primarily offered evidence to show that the proffered reason for termination was not the true reason for the termination. He is challenging the wrong decision.

In the alternative, if the court considers the reasons for the termination, the evidence overwhelmingly affirms that it was not discriminatory. Dr. Carling is mistaken about the evidence upon which Dr. Pantoja's decision to terminate him was based.

A.    Dr. Carling Initiated the Dialogue With UAF Regarding
      <u>Adjunct Status for Other ARS Employees and Himself.</u>

Dr. Carling argues that Dr. Pantoja was wrong when he concluded that Dr. Carling contacted UAF about emeritus and adjunct status for himself and others. Docket 21 at 5. The government agrees that he did not have to discuss emeritus status with the ARS research leader. But the conversation in the email expanded

from emeritus status to adjunct status, which is a benefit for ARS employees. Dr.
Carling should not have even discussed adjunct status, and when UAF brought it
up, he should have immediately stopped the conversation. Instead he told UAF to
contact Dr. Pantoja. This is exactly what Dr. Pantjola did not want. The end
result is that UAF people contacted Dr. Pantoja out of the blue because Dr. Carling
contacted UAF before speaking to Dr. Pantoja.

Before this contact, Dr. Pantoja had informed Dr. Carling in a written email
that he was to co-ordinate things with outside agencies with him first. When Dr.
Pantoja listed his complaints about Dr. Carling in Ex. K, he noted that he had
informed Dr. Carling in an email that all contact with coordinating units had to go
through Dr. Pantoja. He cited as proof to Appendix I.[1] Ex. AA. Dr. Carling does
not deny that he was notified to co-ordinate plans through Dr. Pantoja first, but he
insists that it was a suggestion. It was not. In Appendix I (Ex. AA) Dr. Pantoja
wrote:

> As a unit we should have a single voice **to initiate** collaboration with
> other units of the system and other agencies as well, that is my role as
> RL [research leader], so please coordinate with my office all contacts
> with other units and agencies **before** doing so!

---

[1] The government will request leave of court to add additional factual information,
including Appendix I, II and V to the record. Ex. K refers to the Appendixes as evidence of the
events listed.

(emphasis added).

Exhibit K also refers to another instance when Dr. Carling initiated contact with an outside unit in August.  This statement is verified by Appendix V.  Dr. Carling violated the "suggestion," by contacting an outside ARS unit about travel.  See Docket 21 at 5.  Even a scientist outside ARS expressed his surprise that Dr. Carling had not yet figured out that any outside contact starts with the Research Leader.  Ex. BB

There are no facts in dispute that Dr. Carling contacted UAF and an outside ARS unit without first going through Dr. Pantoja.  The events happened, are not rebutted, and have nothing to do with age.

B.    Dr. Carling Never Requested the Purchase of Any Equipment and Some Travel Was Approved.

1.    Equipment

Dr. Carling argues that Dr. Kuhl, the younger scientist was allowed to purchase equipment that was denied to him.  Dr. Carling was asked if he wanted equipment, but he did not request it.  Ex. CC.  On the list relating to Dr. Carling, similar to the list of purchases made on Dr. Kuhl's behalf, it shows that ARS purchased office furniture for Dr. Carling.  Compare Docket 21 at Ex. 7 with Ex. DD.  Dr. Pantoja informed all the Palmer scientists of an impending deadline for

ordering equipment.  Although Dr. Carling argued that he did not receive

equipment, this allegation is rebutted by the fact that there is no request on his list.

Had there been a request which was rejected it would appear on the form as a

"N/A", as the trip to Grand Forks which was rejected is listed as Ex. DD.

Dr. Kuhl was the first geneticist at the laboratory and needed equipment to

extract DNA.  The most expensive piece of equipment on the list is a SpectraMax

which was listed at $48,686.53.  Docket 21 at Ex. 7.  It is a machine used

especially for DNA analysis.  Ex. EE.  Need, and the timely submission of a

purchase requested, dictated the purchase of equipment - - not age.

> 2.    Dr. Carling's Out-of State Travel Was Disapproved Based on
> Legitimate Reasons .

Dr. Carling also argues that Dr. Kuhl was allowed to travel and he was not.

Dr. Carling took a few trips to Fairbanks, just as Dr. Kuhl did.  Dr. Carling started

with ARS on May 4, 2003.  Within a month he was requesting to go to Finland for

a professional meeting.  Ex. FF.  Besides the fact that this is a very expensive trip

for a scientist who has just started, it is a foreign trip that requires approvals.  Dr.

Carling, new to the federal system, was surprised when he learned about the

government's travel plan requirements for foreign travel.  Ex. FF.  Dr. Carling

presented no evidence that age affected the decision not to finance expensive

foreign travel for a probationary employee.  As to the trip to Grand Forks, it was

not properly initiated through the Research Leader.  See Ex. K; Ex. J ("you do not

coordinate work or initiatives with other units through the administrative office as

instructed.").  Dr. Carling acknowledged this instruction in June when he

contacted someone without asking Dr. Pantoja.  Ex. FF ("I am sorry to have

spoken to Rich Hannan about a possible visit to his site before talking to you.

From now on, I will always speak to you before making contacts outside the

Alaska germplasm program.").  Yet in August, he did it again by contacting John

Clark about the trip to Grand Forks.  Ex. GG.

     C.     Dr. Carling's Prospectus Was Unacceptable and He Did Not Timely
             Communicate with Dr. Pantoja About Revisions.

      Dr. Carling states that the government cited to Ex. Y for the proposition that

Dr. Carling failed to make timely revisions to his research plan, but Ex. Y does not

support that proposition.  Docket 21 at 6.  He is mistaken.  Dr. Pantoja wrote: "It

appeared to me that Dr. Carling did not focus on this very important prospectus

and did not timely make revisions."  Ex. Y at 2.  Moreover, the government

offered Ex. L, a series of emails about the prospectus deadlines, as evidence that

Dr. Carling was not producing an acceptable research plan and was not

communicating with Dr. Carling.  Docket 17 at 7.

Three ARS scientists criticized Dr. Carling's Objective 3. Docket 17 at Ex. L at 953, No. 6 (Dr. Bretting and Dr. Mattheis' email) and Ex. L at 961 (second email) noting that Dr. Radin's comments focused on Objective 3. On September 18, Dr. Mattheis, a scientific reviewer, listed numerous deficiencies about Dr. Carling's contribution to the prospectus. Id. at 1013 (out of sequence).

Dr. Pantoja also perceived that Dr. Carling was not communicating with him. On September 18, Dr. Pantoja forwarded the reviewer's comments to Dr. Carling and discussed it with him. Id. at 946. On September 22, Dr. Pantoja informed Dr. Carling that his research approach was unacceptable. Dr. Carling did not accept the fact that his boss considered his approach unacceptable. Id. at 950. Instead, he wanted to talk to the reviewers and he just informed Dr. Pantoja that he did not understand what was objectionable. Id. Despite the fact that Dr. Carling responded at 10:17 in the morning by 2:59 in the afternoon, Dr. Pantoja was asking whether Don (Dr. Carling) was available. Id. at 950-51. According to Dr. Pantoja's email and letter, Dr. Carling was not available and he had left him messages. Docket 17 at Ex. Y. In the termination letter, Dr. Pantoja explained that he did not just communicate by email. The emails substantiate Dr. Pantoja's efforts to contact Dr. Carling and Dr. Carling's unavailability.

To conclude that Dr. Pantoja rejected Dr. Carling's research prospectus

based on age, one would have to accept that the other reviewers were also motivated by age to find Dr. Carling's plan deficient. Moreover, there is ample evidence that Dr. Carling was not communicating with Dr. Pantoja during the crunch time for the prospectus.

Dr. Carling argues that the prospectus that was ultimately accepted had his section in it. Docket 21 at 7. He is mistaken. The final prospectus entirely eliminated a physiologist and it inserted an entomologist, Dr. Pantoja, as a researcher. Docket 21 at Ex. 3 at 889 (note no physiologist on the list). In 2003, Objective 3 had been Dr. Carling's objective had preliminarily stated: "Characterize, evaluate and document adaptation of selected plant species to biotic and abiotic stresses found in the arctic, subarctic, and alpine ecosystems." Docket 17 at Ex. L at 951 (bottom). After Dr. Carling left ARS, the evolved prospectus of 2004 had an entirely new Objective 3: "Identify key pests on selected crops and native plant species from arctic, subarctic and alpine ecosystems." Docket 21 at Ex. 3 at 895. The objective now focused on pests.

D.    Dr. Carling's Legal Support is Inapplicable.

Dr. Carling cited to four cases and summarily stated that the cases support his premise that the age difference between Dr. Carling and Dr. Kuhl and the allegedly false reasons Dr. Pantoja gave for terminating Dr. Carling support a

conclusion that the age discrimination in the termination is intertwined with and supports a finding of age discrimination in the failure to re-hire. Docket 21 at 9. None of those cases stand for that proposition. None of them deal with an individual who was terminated and then re-applied for his old job.

In Yancey v. Weyerhaeuser Co., 277 F.3d 1021 (8th Cir. 2002), Yancey and his son both worked for the company. The company informed the older Yancey that he or his son had to resign because of the nepotism policy. The elder Yancey resigned and then filed suit for age discrimination. Yancey never re-applied for his old job.

In Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), a jury concluded that the company did not terminate Mr. Reeves based on his age, but the appellate court overturned that decision. Mr. Reeves had presented evidence that the decision maker had told him that he "was so old [he] must have come over on the Mayflower" and, on one occasion when petitioner was having difficulty starting a machine, that he "was too damn old to do [his] job." Moreover, the decision maker would regularly "cuss at [the plaintiff] and shake his finger in my face." Id. at 151. This case, too, does not involve a re-hire, and the Plaintiff produced direct evidence of age-related bias, which is not present in our case.

In <u>Crocket v. Abraham</u>, 284 F.3d 131 (D.C. Cir. 2001), the plaintiff, an attorney in the Department of Energy, claimed that he was not promoted based on age. After a bench trial, the court concluded that Mr. Crocket was not denied the promotion based on age. <u>Id</u>. at 133. On appeal the court concluded that the younger attorney had more skills in the areas deemed essential by the Department and that Mr. Crocket had not presented any evidence to rebut the Department's assertion. There is nothing in <u>Crocket</u> that deals with a termination and rehire.

Lastly, <u>EEOC v. the Board of Regents of the University of Wisconsin System</u>, 288 F.3d 296 (7th Cir.2002), involved a jury trial regarding four employees' claims that they were terminated on the basis of age. The only remotely similar issue was the Defendant's claim that the four did not mitigate their damages because they did not reapply for openings at the University Press. The court did not require them to apply for positions under the circumstances because "after just being terminated for alleged deficiencies in their performance and skills, they had no reason to believe they would be hired if they did apply." 288 F.3d at 304. Thus, the decision, supports the ARS's position that it is unreasonable to expect to be re-hired after a termination. Even Dr. Carling artfully admitted that the fact that he had just been fired would be an obstacle.

In sum, none of the cases stand for the proposition that the allegedly false

reasons Dr. Pantoja gave for terminating Dr. Carling can be used to rebut the decision he made not to re-hire Dr. Carling.

## CONCLUSION

According to Dr. Carling, if any of the reasons Dr. Pantoja set forth are not true, then he has rebutted the legitimate non-discriminatory reason given for Dr. Pantoja's failure to re-hire Dr. Carling.  But he cannot avoid the basic fact that the discriminatory action in this case is only the failure to re-hire.  The reason given for not hiring Dr. Carling is that Dr. Pantoja "had just terminated him for the reasons stated in the termination letter. . . [He] was concerned about past performance and research skills".  He had worked with Dr. Carling before and was unhappy about his ability to keep him informed.  The other candidates had molecular research skills that Dr. Carling lacked.  Docket 17 at Ex. Y at ¶ 5. There is nothing pretextual about this reason.  The Seventh Circuit Court agreed when it found that it was unlikely someone would be hired after just being fired. Dr. Carling produced no direct or circumstantial evidence of age discrimination.

Moreover, given that Dr. Pantoja participated in hiring Dr. Carling and he had met him before the decision was made, he receives a presumption that age did not play a role in the termination.  As stated above, the firing decision is not at

issue in this case.  Dr. Carling cannot avoid the legal bar to litigating wrongful

termination by bootstrapping it onto his failure to re-hire claim.

Otherwise, all an employee would have to do to litigate an issue that is barred, is

to re-apply for the position and wait for the inevitable decision not to re-hire.

For the foregoing reasons, the government asks the court to grant it summary

judgment.

      RESPECTFULLY SUBMITTED on May 19, 2006.

                        DEBORAH M. SMITH
                        Acting United States Attorney

                        s/ Susan J. Lindquist
                        Assistant U. S. Attorney
                        222 West 7th Ave., #9, Rm. 253
                        Anchorage, AK 99513-7567
                        Phone: (907) 271-3378
                        Fax: (907) 271-2344
                        E-mail: susan.lindquist@usdoj.gov
                        AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2006
a copy of the foregoing **DEFENDANT'S REPLY
TO PLAINTIFF'S OPPOSITION TO ITS MOTION
FOR SUMMARY JUDGMENT** was served
electronically on Hugh W. Fleischer.

s/ Susan J. Lindquist